**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-cr-417-APM** |
| **RICHARD MARKEY**<br>**MICHAEL ROBERTS** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. Richard Markey pleaded guilty to one count of Assaulting Certain Officers Using a Dangerous Weapon, in violation of Title 18, United States Code, Sections 111(a)(1) and (b). Michael Roberts pleaded guilty to one count of Assaulting Certain Officers, in violation of 18, United States Code, Section 111(a)(1).

For the reasons set forth herein, the government requests that this Court sentence Markey to 54 months of incarceration, 3 years of supervised release, $2,000 in restitution, and a $100 mandatory assessment fee. Based on the government's calculation, Markey's guidelines range is 46 to 57 months.

The government requests that this Court sentence Roberts to 27 months of incarceration, 3 years of supervised release, $2,000 in restitution, and a $100 mandatory assessment fee. Based on the government's calculation, Roberts's guidelines range is 24 to 30 months.

The government's recommendations—at roughly the midpoint of the defendants' respective guidelines ranges—are warranted to reflect the seriousness and violence of Markey's

1

and Roberts's conduct in assaulting officers on January 6 while acknowledging their acceptance of responsibility.

## I.    INTRODUCTION

The defendants, Richard Markey and Michael Roberts, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

Markey, an HVAC technician living in Connecticut, and Roberts, a pipe fitter and mechanical supervisor living in Tennessee, traveled from their respective homes on January 5, 2021. The next day, both Markey and Roberts joined the riotous mob that breached the Capitol grounds and, by approximately 3:54 p.m., reached the front of the crowd at the "Tunnel" on the Lower West Terrace (LWT").[2] Once there, Markey climbed up on top of his fellow rioters and threw himself across them to begin assaulting the police officers defending the Tunnel. Markey's assault began with attempted strikes with a baton, but he quickly lost balance and officers were

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

[2] The "Tunnel" on the LWT is actually a passageway connecting the inaugural platform and LWT with the interior of the Capitol building.

able to wrest the baton away from him. Undeterred, Markey began striking viciously at the police officers. Shortly thereafter, Roberts also climbed onto his fellow rioters and sprung at the police officers, striking several with his fists and grappling with their arms and hands. While Roberts attacked one set of officers, Markey slid past him to attack officers near the middle of the entrance to the Tunnel. Once there, Markey kicked and pulled on the officers' riot shields, standing up on other rioters to get better leverage. Finally, he took hold of a pole and used that to strike at police officers.

The government recommends that the Court sentence Markey to 54 months of incarceration and Roberts to 27 months of incarceration. These recommendations reflect the gravity of Markey's and Robert's conduct, but also acknowledges their admission of guilt.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statements of Offense filed in this case, ECF 29 (Roberts) and ECF 34 (Markey), for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.    Markey's and Roberts's Roles in the January 6, 2021 Attack on the Capitol

*Roberts's Pre-January 6 Text Messages with Ronald Colton McAbee*

Roberts began making plans to travel to Washington, D.C., as early as December 31, 2020, texting with his associate Ronald Colton McAbee[3] to make arrangements for their trip from

---

[3] Ronald Colton McAbee was also charged in connection with his conduct at the Capitol on January 6, 2021. On September 25, 2023, McAbee pleaded guilty to assaulting, resisting, or

Tennessee to Washington, D.C. For example, on December 31, 2021, they exchanged the following text messages:

McAbee:        Hey buddy. You going to DC on the 6th?

McAbee:        I want to go but only if you're going. I'm not in shape to fight right now.

Roberts:       Yes sir I sure am!

McAbee:        Let's link up and go. I'll slap a commie with this dead arm.

McAbee:        Call me after work.

Roberts:       Sounds good to me.

Roberts:       That's what I'll carry in my pocket.

Roberts then attached a photograph to his text message displaying what appears to be brass knuckles, a knife, and a handgun magazine.

---

impeding certain officers, in violation of 18 U.S.C. § 111(a)(1) [Count 12s], and to committing an act of physical violence in the Capitol grounds or building, in violation of 40 U.S.C. § 5104(e)(2)(F) [Count 24s]. On October 11, 2023, a jury convicted McAbee of inflicting bodily injury on certain officers, in violation of 18 U.S.C. §§ 111(a)(1) and (b) [Count 9s]; civil disorder, in violation of 18 U.S.C. § 231(a)(3) [Count 14s]; entering and remaining in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A) [Count 18s]; disorderly and disruptive conduct in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A) [Count 19s]; and engaging in physical violence in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A) [Count 20s].

On February 29, 2024, the Honorable Rudolph Contreras sentenced Ronald Colton McAbee to a term of 70 months of imprisonment. *United States v. Sabol et al.*, 21-cr-00035-RC, Minute Entry dated Feb. 29, 2024.



*Photograph 1 sent via text message from Roberts to McAbee during December 31, 2020.*

When McAbee asked how he might get some "knuckles," Roberts suggested trying Amazon and offered his residence as a shipping address:

| | |
|---|---|
| McAbee: | How can I get some knuckles? |
| Roberts: | Amazon is quick. |
| McAbee: | So I've got a tire repair kit and the t handle tire puncture is a great tool |
| Roberts: | Lol this is true! |
| Roberts: | Check this out at Amazon. Steel Outdoor Reinforced Brass Knuckle Motorcycle Motorbike Powersports Racing . . . (Medium, Black) https://www[URL REDACTED] |
| Roberts: | Just ordered these |
| Roberts: | If you want some, have them shipped here. [ADDRESS REDACTED]. |

McAbee:        Alright I'll shop around.

Shortly thereafter, Roberts described a conversation with his son in which he anticipated engaging in violence while in Washington, D.C., and assured McAbee of his willingness to face death:

Roberts:       I had to explain to [my son] last night why I was going to DC and what could happen. This is my fight so he doesn't have to fight.

Roberts:       Nicotine patches?

McAbee:        I will rise or fall along side you. This is for future generations.

McAbee:        Nah my morale patches.

Roberts:       Lmao, I was just kidding lol.

McAbee:        I'm bringing my nicotine.

Roberts:       I'm at peace with death and what I might have to do.

These text messages (concerning his son and his expectation of violence) are consistent with statements Roberts made in a recorded interview at the U.S. Capitol on January 6 (Video Exhibit 1 and described below) in which he claimed that he might "not come home."

In a text exchange on January 3, 2021, they confirmed their travel plans to and from Washington, D.C.:

Roberts:       You still good to go?

McAbee:        Hell yeah brother!

Roberts:       We will leave at 10:00am Tuesday and 5 or 6 am Thursday.

McAbee:        Still doing all black?

Roberts:       Bring black thermals and maga gear as well.

On January 4, 2021, McAbee sent and Roberts exchanged additional text messages in which McAbee asked about whether Roberts had joined the Proud Boys yet:

McAbee:        What's the password to the PBUSA

Roberts:       Idk lol

McAbee:        Oh. I thought you were involved.

Roberts:       Ready to roll.

Roberts then attached a photograph to that text message displaying what appears to be two knives, brass knuckles, two knives, and reinforced gloves.



*Photograph 2 sent via text message from Roberts to McAbee during January 4, 2020.*

McAbee:        Damn. My Arsenal doesn't look that good.

Roberts:       Not yet anyway. They have paused membership.

Roberts:    I'll have gloves for you tomorrow.

McAbee:    Gotcha. I noticed they have a Knoxville chapter.

McAbee:    Ok. How much do I owe you all together.

Roberts:    I have extra knives.

Roberts:    25 for the shirt if you want it and 17 for the gloves.

McAbee:    Ok I gotcha.

Later that same day, Roberts texted McAbee that he had completed his Proud Boys paperwork.

Roberts:    Just filled my papers out for the PB

McAbee:    You western chauvinist lol

Roberts:    West is best baby! Fuck them all

They then resumed texting about the logistics of their drive to Washington, D.C. The next day, on January 5, 2021, Roberts and McAbee traveled together from Tennessee to Washington, D.C.

### *January 6 at the United States Capitol*

On January 6, both defendants went to the United States Capitol building along with thousands of other rioters. While on the U.S. Capitol building grounds during the riot on January 6, 2021, Roberts was interviewed wearing a bandana around his neck and a red quarter-zip hoodie with "MAGA" written across the chest.

8



*Image 1: Exhibit 1 Video Still at 0:10 showing an interview with Roberts (circled in red) on the Capitol Grounds during the January 6 riot.*

During the interview, Roberts stated the following:

> Our country is worth fighting for every day until this election is over and Donald J. Trump is put back in that White House, 100% and definitely . . . Man, this isn't just a fight for Donald Trump. This is a fight of good versus evil, right versus wrong. I love my country. I had to tell my son before I left home, "Listen son, I'm doing this for you. Daddy may not come home." But that's okay. I'll stand in the gap so he doesn't have to. So your kids don't have to. I'll take whatever comes.

Beginning at approximately 2:42 p.m., rioters began to enter Tunnel on the LWT and attack the officers there. Rioters shattered the glass and forced open the doors that led into the Capitol building. In response, officers from both the United States Capitol Police ("USCP") and the Metropolitan Police Department ("MPD") formed a police line blocking the entrance into the Capitol. Numerous rioters sought to breach the police line that formed in the Tunnel. The rioters

used various weapons, as well as the force of their bodies, to attempt to overcome the officers. Many of the rioters assaulted USCP and MPD officers by hurling objects at them, physically striking them with batons and other blunt instruments, using lights to distract and disorient the officers, shocking them with electrical devices, crushing them between the doors and walls in the confined space, and spraying chemical irritants and fire extinguishers at them.

Between approximately 3:21 p.m. and 3:54 p.m., law enforcement officers maintained a police line at the mouth of the Tunnel while rioters continuously sought to push through the line and to assault the officers defending the U.S. Capitol building. Both defendants pushed their way through the mob on the LWT to the very mouth of the Tunnel. Beginning at approximately 3:54 p.m., while officers remained in a line at the Tunnel defending the Capitol, Markey and Roberts emerged from the riotous mob near the south end of the Tunnel and then swiftly climbed on top of other rioters in order to attack the police line defending the Tunnel.

**The Defendants' Assault of Police Officers Defending the Capitol Building**



*Image 2: Exhibit 2 Video still at 3:54:24 p.m. showing Markey (circled in yellow) climbing over rioters to assault officers defending the Tunnel with a baton.*

Markey wore a dark colored hat and a shirt. Roberts wore a baseball hat and the same red "MAGA" sweatshirt. Both were imposing figures: Markey weighed approximately 205 pounds and stood roughly 5 feet and 8 inches tall, while Roberts weighed approximately 270 pounds and stood roughly 6 feet tall.



*Image 3: Exhibit 3 Video still at 0:18 showing Markey (circled in yellow) climbing over rioters to assault officers defending the Tunnel with a baton and Roberts (circled in red) approaching from behind.*

The police officers defending the Tunnel were readily identifiable as police officers, wearing police uniforms, badges, and marked police helmets; some additionally carried police riot shields, leaving no doubt that those officers were police officers working to protect the Capitol from the riotous mob. Markey's and Roberts's assault of the officers at the Tunnel lasted several minutes -- from approximately 3:54 p.m. until 3:57 p.m.

Initially, Markey wielded a police baton against the police officers. At approximately 3:54 p.m., Markey swung the baton from his vantage above other rioters, causing officers to react and attempt to deflect blows from the baton.



*Image 4: Exhibit 2 Video still at 3:54:28 p.m. showing Markey (circled in yellow) climbing over rioters to assault officers defending the Tunnel with a baton. At least one officer raises a hand to attempt to deflect the assault (circled in blue).*

Shortly thereafter, that same officer was able to grab hold of the end of Markey's baton and wrest it from his grasp, thus (temporarily) disarming him.



*Image 5: Exhibit 2 Video still at 3:54:29 p.m. showing a police officer (hand circled in blue) disarming Markey (circled in yellow) by wresting the police baton from Markey's grasp.*

Despite being disarmed, Markey continued his assault of the officers by swinging at them with his hands in a further attempt to strike them. Notwithstanding his signed plea statement agreeing that he initially "wielded a police baton, but even after losing hold of the baton, he continued to swing at officers in a further attempt to strike them," Markey Statement of Offense (ECF 29 at ¶11) and PSR ¶32, Markey now insists that he "never swung the police baton at the officers." PSR ¶32. Video Exhibit 2 demonstrates otherwise.

       Behind Markey, and further outside the Tunnel, Roberts began to climb on top of other

rioters in order to approach and assault the police officers holding the line.



*Image 6: Exhibit 3 Video still at 0:37 showing Roberts (circled in red) climbing over rioters to assault officers defending the Tunnel and approaching Markey (circled in yellow) from behind.*

Seconds later, at approximately 3:54 p.m., Roberts joined the attack on the officers, climbing over other rioters and emerging past Markey from the south side of the Tunnel.



*Image 7: Exhibit 4 Video still at 0:14 showing Roberts (circled in red) moving past Markey (circled in yellow) while climbing over rioters to assault officers defending the Tunnel.*



*Image 8: Exhibit 2 Video still at 3:54:49 p.m. showing Roberts (circled in red) moving past Markey (circled in yellow) while climbing over rioters to assault officers defending the Tunnel*



*Image 9: Exhibit 2 Video still at 3:54:53 p.m. showing Roberts (circled in red) assaulting officers while Markey (circled in yellow) repositioned behind him.*

Like Markey, Roberts climbed on top of other rioters and used his vantage there to repeatedly

assault the police officers defending the Capitol building. The two worked together in concert to forcibly attack the officers at the same time.



*Image 10: Exhibit 2 Video still at 3:54:58 p.m. showing Roberts (circled in red) and Markey assaulting officers together at the Tunnel.*

Markey moved closer to the police line and forcibly struck a police shield held by two MPD officers with his hands. He also began to pull on the police shield held by those officers.



*Image 11: Exhibit 2 Video still at 3:55:14 p.m. showing Roberts (circled in red) grappling with officers and Markey (circled in yellow) grabbing hold of a shield held by officers.*

Markey then balanced himself standing on top of other rioters, grabbed the shield held by MPD officers again, yelled something at them, and then forcibly kicked the shield several times with considerable force.



*Image 12: Exhibit 2 Video still at 3:55:24 p.m. showing Markey (circled in yellow) kicking at a shield held by officers (shoe circled in blue).*

Another MPD officer used a pole to attempt to deter Markey's assault on those officers, until Markey pulled the pole from that officer's grasp at approximately 3:55 p.m.



*Image 13: Exhibit 2 Video still at 3:55:28 p.m. showing Roberts (circled in yellow) grabbing a pole away from an MPD officer.*

The pole snapped into two, and Markey grabbed hold of part of it and used it to strike at the same shield held by several MPD officers directly in front of him.



*Image 14: Exhibit 5 Video still at 3:55:39 p.m. showing Markey (circled in yellow) striking MPD officers with the pole.*



*Image 15: Exhibit 2 Video still at 3:55:42 p.m. showing Markey (circled in yellow) striking MPD officers with the pole.*

Markey struck officers with the pole seven distinct times, shouting "Let us in! Let us in!" as he did so. He swung the pole with such force than on the seventh strike the pole broke. Markey struck the shield held by the police officers one final time before discarding the remaining piece. Even after discarding his weapon, Markey did not stop assaulting the officers. He resumed grabbing hold of a riot shield held by police officers, pushing it with his hands and turning it parallel to the ground to render it ineffective. He briefly paused pushing on the shield to point at an MPD officer and scream, "Oath breaker! Oath breaker! You're not doing your fucking job. Listen! I fought for this fucking country!"



*Image 16: Exhibit 5 Video still at 3:56:23 p.m. showing Markey (circled in yellow) pointing and shouting at MPD officers.*

He then resumed pushing down on the shield in front of him, while other rioters swung down to stomp on the officers behind the shield. The rioters holding Markey and Roberts up eventually set them down at the front of the police line.

### *Roberts's Post-January 6 Text Messages with Ronald Colton McAbee*

On or about January 10, 2021, Roberts sent a text message to McAbee telling him to watch a video YouTube called "Storming the Capitol – Street Interviews" at the 9-minute mark. That video showed the interview of Roberts on January 6, 2021, on the U.S. Capitol grounds described

above and depicted in Video Exhibit 1. Shortly after Roberts texted the link to McAbee, McAbee responded:

| | |
|---|---|
| McAbee: | Oh damn. |
| Roberts: | It's just me. |
| McAbee: | Hope the FBI doesn't come looking for you. |
| Roberts: | I wasn't in the building. I was exercising my 1st amendment. |
| McAbee: | Exactly! The Spirit!! |
| Roberts: | We done nothing wrong. |

## III.    THE CHARGES AND PLEA AGREEMENTS

On November 29, 2023, a federal grand jury returned an indictment charging Markey with eight counts, including Assaulting Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b). Indictment Dkt. 16 at 3; Markey PSR ¶¶1-2. On August 19, 2024, Markey was convicted of that offense (Count Three of the Indictment) based on a guilty plea entered pursuant to a plea agreement. Markey Plea Agreement ¶1, Dkt. 33; Markey PSR ¶6.

On November 29, 2023, a federal grand jury returned an indictment charging Roberts with seven counts, including, Assaulting Certain Officers, in violation of 18 U.S.C. § 111(a)(1). Indictment Dkt. 16 at 2; Roberts PSR ¶¶1 & 3. On June 17, 2024, Roberts was convicted of that offense (Count Two of the Indictment) based on a guilty plea entered pursuant to a plea agreement. Roberts Plea Agreement ¶1, Dkt. 28; Roberts PSR ¶6.

## IV.    STATUTORY PENALTIES

Markey now faces sentencing for Assaulting Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b). As noted by the plea agreement and the Presentence

Report issued by the U.S. Probation Office, he faces up to 20 years of imprisonment, supervised release term of not more than three years, a fine up to $250,000, and a mandatory assessment of $100.

Roberts now faces sentencing for Assaulting Certain Officers, in violation of 18 U.S.C. § 111(a)(1). As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, he faces up to 8 years of imprisonment, a supervised release term of not more than three years, a fine up to $250,000, and a mandatory assessment of $100.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

A.  Sentencing Guidelines Calculations – Markey

The government submits that the Guidelines analysis for Markey's offense of conviction is as follows:

Count Three: Assaulting Certain Officers Using a Dangerous Weapon, 18 U.S.C. §§ 111(a)(1) & (b)

| | |
|---|---|
| Base Offense Level: U.S.S.G. § 2A2.2 | 14 |
| | |
| Specific Offense Characteristics | |
| U.S.S.G. § 2A2.2(b)(2)(B) Use of a dangerous weapon | +4 |
| U.S.S.G. § 2A2.2(b)(7) Conviction under 18 U.S.C. § 111(b) | +2 |
| | |
| Applicable Adjustments | |
| Official victim, U.S.S.G. § 3A1.2(a), (b) | +6 |
| | |
| Total offense level: | 26 |

*See* Plea Agreement ¶5A (Dkt. 33). This is the same calculation arrived at by the USPO. *See* Markey PSR ¶¶44-51. Markey does not dispute this calculation.

    B.  <u>Sentencing Guidelines Calculations – Roberts</u>

    The government submits that the Guidelines analysis for Robert's offense of conviction is as follows:

<u>Count Two</u>: Assaulting, Resisting, or Impeding Certain Officers, 18 U.S.C. §§ 111(a)(1)

| | |
|---|---|
| Base Offense Level: U.S.S.G. § 2A2.2[4] | 14 |
| Applicable Adjustments | |
|     Official victim, U.S.S.G. § 3A1.2(a), (b) | +6 |
|         Total offense level: | 20 |

*See* Plea Agreement ¶5A (Dkt. 28). This is the same calculation arrived at by the USPO. *See* Roberts PSR ¶¶42-48. Roberts does not dispute this calculation.

    C.  <u>Undisputed Inapplicability of 4C1.1 – Markey and Roberts</u>

    Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. As agreed upon by the parties, Section 4C1.1 does not apply in this case.  Even if this had not been agreed upon, the application of 4C1.1 would be inappropriate here where the defendants used "violence or credible threats of violence." *See* U.S.S.G. § 4C1.1(3). Additionally Markey is not entitled to the reduction

---

[4] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

because he used a dangerous weapon in connection with the offense. *See* U.S.S.G. § 4C1.1(a)(7). *See* Markey Plea Agreement ¶5C, Dkt. 33, and Roberts Plea Agreement ¶5C, Dkt. 28.

    D.  <u>The Government's Calculated Sentencing Range for Markey</u>

The U.S. Probation Office calculated Markey's criminal history as category I, which is not disputed. PSR ¶59. Accordingly, the government's calculation of Markey's total adjusted offense level, after acceptance of responsibility, is **23**. The resulting sentencing guidelines range is therefore **46 to 57** months' imprisonment. Markey's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation here. *See* Markey Plea Agreement ¶5D, Dkt. 33.

    E.  <u>The Government's Calculated Sentencing Range for Roberts</u>

The U.S. Probation Office calculated Roberts's criminal history as category I, which is not disputed. PSR ¶53. Accordingly, the government's calculation of Roberts's total adjusted offense level, after acceptance of responsibility, is **17**. The resulting sentencing guidelines range is therefore **24 to 30** months' imprisonment. Roberts's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation here. Roberts Plea Agreement ¶5D, Dkt. 28.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.   Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Markey's and Roberts's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification

vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis.

Roberts prepared for violence weeks in advance, texting with McAbee about obtaining and bringing "knuckles" and other weapons before traveling to Washington, D.C. Once at the U.S. Capitol grounds, both Markey and Roberts went to the Tunnel, the site of some of the most brutal and violent assaults against police officers that day. Even among other rioters attacking police there, the defendants' conduct was shocking: both literally climbed over other rioters in order to assault the police officers guarding the entrance to the U.S. Capitol building. Roberts repeatedly grappled with and attacked officers using his hands, pushing and shoving them from above. Markey's conduct was even more egregious: he initially sought to attack the officers with a baton, and only stopped when an officer was able to physically disarm him and seize the baton. Markey remained undeterred, and repeatedly assaulted officers with any means available: pulling on their shields, kicking violently at them with his feet, and finally using a pole to repeatedly strike at them until he had shattered it against their shield. Even then, he continued to scream at and threaten the officers, accusing them of breaking their oaths. In text messages between Roberts and McAbee days later, Roberts still maintained he had done nothing wrong but was simply exercising his First Amendment rights. The nature and circumstances of Markey's and Roberts's offenses were of the utmost seriousness, and fully support the government's recommended mid-range sentences of 54 months (Markey) and 27 months (Roberts).

### B. The Defendants' History and Characteristics

*Markey*

Markey reported having a good upbringing in a nice, rural area, and never suffered any

form of abuse. PSR ¶67. He is married with two juvenile children ¶68. He continues to enjoy the support of his family. ¶70. He remains in good physical health and has no history of mental health issues. Although he acknowledged using marijuana once as a senior in high school and occasionally consuming marijuana gummies, PSR ¶79, he failed to inform the U.S. Probation department that he was discharged from the U.S. Coast Guard on July 30, 2009, with a general discharge due to "misconduct" arising from his "involvement" with drugs in June 2009. He instead attributed his discharge to an altercation with another enlisted service member. PSR ¶83. Markey graduated from high school in 2003, and subsequently attended other schools for professional certifications. PSR ¶81. He was employed as a plumber and HVAC technician, earning approximately $80,000 per year. Markey was enlisted in the Coast Guard from approximately 2.5 years prior to being discharged for misconduct. PSR ¶83. Markey has no convictions. PSR ¶¶57-58.

Despite the advantages of steady employment and a supportive family, Markey left his home and family in Connecticut and traveled to Washington, D.C., to breach the Capitol grounds and viciously and repeatedly assault police officers: with a baton, with his hands, with his foot, and finally, with a pole. These factors highlight that Markey had choices other than engaging in violent conduct on January 6. During his assault on those officers, Markey referenced his military service and claimed to have "fought for this fucking country." Exhibit 5. In fact, his assault on police officers merely doing their job to defend the Capitol was a betrayal of his enlistment oath. Markey's history and characteristics weight heavily in favor of a significant term of incarceration.

*Roberts*

Roberts reported having strong and close relationship with most of his family members and

a childhood free of abuse or neglect. PSR ¶64. He is now separated from his wife but maintains a cordial relationship with her, and they share one son. PSR ¶65. Roberts has not, however, provided collateral sources or contacts. PSR ¶ 61 & n.3. Roberts remains in good health with no chronic medical issues. PSR ¶70. He reported that he was diagnosed with Attention Deficit and Hyperactivity Disorder as a child. PSR ¶71. He has acknowledged past experimentation with various illegal drugs and sporadic overuse of alcohol. PSR ¶73. Roberts graduated from high school in 2007 and has obtained licenses and certifications in plumbing and medical gas. PSR ¶75. From 2014 through November 2023, Roberts was earning $112,000 per year working at the Oak Ridge National Laboratory in Oak Ridge, Tennessee. He was terminated from that position as a result of his arrest in this case. PSR ¶80. Since his termination, he has worked as a plumber for various companies. PSR ¶¶78-79.

Like Markey, Roberts had fulsome familial support and a successful career, but nonetheless made plans in advance of January 6 to bring brass knuckles (and to help McAbee obtain a similar weapon) to Washington, D.C., in anticipation of engaging in violence there. Indeed, he bragged on at least two separate occasions that he had told his son that he had to go to D.C. to fight, and warning that he "may not come home." Once at the Capitol, Roberts followed through on his threats and physically launched himself at police officers. At 6 feet tall and 270 pounds, PSR ¶69, Roberts crashed into the defending officers with considerable force, and contributed significantly to the violence at the Tunnel. Roberts's history and characteristics militate in favor of a significant term of incarceration.

**C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. The criminal conduct on January 6 of both defendants was the epitome of disrespect for the law. "We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power." *United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20.

**D.    The Need for the Sentence to Afford Adequate Deterrence**

***General Deterrence***

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[5] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

***Specific Deterrence***

The need for the sentence to provide specific deterrence to these particular defendants also weighs heavily in favor of a lengthy term of incarceration.

*Markey*

At the time Markey violently assaulted police officers defending the U.S. Capitol, he was himself a former U.S. service member. Despite his oath to the Constitution, and his years of

---

[5] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

training and experience in the military, Markey climbed over numerous other rioters for the opportunity to personally assault police officers attempting to do their job and fulfill their sworn obligation to defend the U.S. Capitol, members of Congress and their staff, and then Vice President Pence and the U.S. Secret Service officers assigned to protect him. Even after assaulting multiple police officers multiple times, Markey remained at the threshold of the Tunnel—while officers remained locked in a struggle with other rioters—and screamed at those officers and accused them of not doing their jobs and of abandoning their oaths. Exhibit 5.

In addition, despite his signed plea agreement and statement of offense, Markey now seeks to minimize and distance himself from the conduct described in those documents. For example, Markey's signed statement of offense states: "Initially, Markey wielded a police baton, but even after losing hold of the baton, he continued to swing at officers in a further attempt to strike them." Markey Statement of Offense (ECF 29 at ¶11); PSR ¶32. Markey now insists that he "never swung the police baton at the officers." PSR ¶32. Video Exhibit 2, however, demonstrates otherwise. At 3:54:28 (0:09), Markey raised his arm holding the baton and extended it towards the police officers. As he began to swing the baton down at the officers (at 3:54:28 and 0:10), Markey lost his balance and began to pitch forward (at 3:54:29 and 0:10). As he lost control of his body and his legs came up behind him (at 3:54:29 and 0:11), police officers were able to grab hold of the end of the baton and seize it from him (at 3:54:30 and 0:11). Markey swung his baton at the officers but was unable to strike them effectively because he lost his balance atop other rioters. The video reveals that Markey swung the baton at the officers in order to assault them. His inability to do so resulted from his loss of balance, rather than any lack of intent. That Markey now seeks to minimize his culpability despite his signed statement of offense as well clear video evidence of his

various assaults on police officers demonstrates a lack of remorse that militates further in favor of a significant term of incarceration.

*ROBERTS*

Like Markey, Roberts was so eager to assault police officers defending the Capitol that he climbed over other rioters to do so. Once in range, he lashed out and struck at multiple officers with abandon, grappling with them and trying to grab hold of their hands and arms. Even after he stopped directly attacking officers, he remained at the front of the mob as other rioters, including Markey, continued to assault them. As Roberts post-January 6 text messages demonstrate, he recognized that the video of him on the U.S. Capitol grounds stating that he had come to Washington, D.C., intending to fight ("I had to tell my son before I left home, 'Listen son, I'm doing this for you. Daddy may not come home'") might draw law enforcement scrutiny, but instead of expressing any remorse or contrition for assaulting police officers he insisted that he had done nothing wrong ("I wasn't in the building. I was exercising my 1st amendment.").

Insofar as either defendant may at sentencing express some measure of remorse for his conduct, the timing suggests that the motivation for such "remorse" derives largely from a fear of imminent consequences. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan). The sentences for both defendants must be sufficient to provide specific deterrence from committing

future crimes of violence.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[6] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

---

[6] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[7] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

*MARKEY*

Markey's conduct is comparable to that in *United States v. Thomas Ballard*, 21-cr-553 (RJL). Like Markey, Ballard pleaded guilty to a single count of 18 U.S.C. § 111(b) and had the same calculated guidelines range (46-57 months). Judge Leon sentenced Ballard to 54 months of incarceration and 36 months of supervised release. Ballard struck an officer's hand with his hand on the West Plaza, and like Markey armed himself with a baton. Ballard, like Markey, made his way to the Tunnel and repeatedly assaulted officers there with various weapons, (including scaffolding, wooden planks, a metal pole, and a police baton) and by throwing various objects at them (parts of a broken table, a pole, an unknown liquid). He additionally pointed a flashing strobe light at the defending officers in an effort to distract them. A sentence of 54 months for Markey would not create an unwarranted disparity.

Likewise, Markey's conduct on January 6 is even worse than the defendant's in *United States v. Jeffrey Brown*, 21-cr-0178 (APM). On January 6 at the Tunnel, Brown sprayed an orange

---

[7] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

liquid from an unmarked cannister at the officers defending the U.S. Capitol. The stream of liquid did not directly hit any of the officers. Brown also participated in a "heave ho" while in the Tunnel, pushing in unison with the mob. Markey's assaultive conduct was far more egregious. Markey assaulted multiple officers over a period of minutes, swinging downwards at them with a police baton, pulling and kicking on their riot shields, and assaulting officers with a pole. During his physical assault, Markey screamed at the officers in the Tunnel. Like Markey, Brown had calculated offense level of 26 based on his conviction for 111(b), but Brown, who had a criminal history and was convicted after trial rather than after a plea, had a higher sentencing guidelines range. This Court sentenced Brown to 54 months of incarceration. That sentence is consistent with a sentence of 54 months for Markey in light of the Markey's direct physical assault on numerous officers in the Tunnel.

*ROBERTS*

Robert's conduct is comparable to the defendant in *United States v. James Weeks*, 24-cr-131 (BAH), who was sentenced to 27 months of incarceration. Like Roberts, Weeks pleaded guilty to a single count of violating 18 U.S.C. § 111(a). As a result, Roberts and Weeks has the same sentencing guidelines range (24-30 months' imprisonment). Like Roberts, Weeks assaulted officers in the Tunnel, the location of some of the most violent conduct on January 6. Weeks pushed forward into the Tunnel, shouting for "fresh people" and encouraging rioters to push against the police line. Weeks also pushed open one of the doors in the Tunnel, affording rioters greater direct access to assault officers. Roberts, through his example of visibly body surfing over rioters in order to assault police officers, likewise encouraged other rioters to confront and assault the police officers in the Tunnel. If anything, Roberts's conduct within the Tunnel was even more

egregious than that of Weeks. A sentence of 27 months' incarceration for Roberts is consistent with the sentence the Court imposed on Weeks.

Roberts's conduct is also comparable to that of the defendant in *United States v. Kevin Louis Galetto*, 24-cr-131 (CKK) who was sentenced to a period of 27 months of incarceration. Like Roberts, Galetto's sentencing guidelines range was 24 to 30. Like Roberts, Galetto made his way to the front of the mob at the Tunnel and assaulted police officers there. While Galetto spent more total time in the Tunnel than Roberts's, Roberts's attacks on officers after body-surfing to the front of the mob were more egregious and violent. Galetto had no criminal convictions and had never been previously arrested. A sentence of 27 months for Roberts would not create an unwarranted disparity.

## VII.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Likewise, the Mandatory Victims Restitution Act ("MVRA") applies to Markey and Roberts here.[8] Markey PSR ¶39; Roberts PSR ¶36. Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United*

---

[8] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

*States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that both Markey and Roberts must pay $2,000 in restitution each, which reflects in part the role they played in the riot on January 6.[9] Markey Plea Agreement at ¶12; Roberts Plea Agreement at ¶12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* Both Markey's and Roberts's respective restitution payments must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* Markey PSR ¶116; Roberts PSR ¶113.

### VIII.   FINE

Markey's conviction for a violation of 18 U.S.C. § 111(b) subjects him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). Roberts's conviction for a violation of 18 U.S.C. § 111(a) also subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. §

---

[9] Unlike under the Sentencing Guidelines for which the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, the defendants have not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e).

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court sentence Markey to 54 months of incarceration, 3 years of supervised release, $2,000 in restitution, and a $100 mandatory assessment fee. The government recommends that the Court sentence Roberts to 27 months of incarceration, 3 years of supervised release, $2,000 in restitution, and a $100 mandatory assessment fee.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY: _____
Craig Estes
Assistant U.S. Attorney Detailee

John Joseph Moakley Federal Courthouse
1 Courthouse Way
Boston, MA 02210
(617) 748-3100
Craig.Estes@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that on this date, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

 /s/ *Craig Estes*
Craig Estes
Assistant U.S. Attorney (detailee)